Case number 19-1224, et al. Belmont Municipal Light Department, et al, petitioners versus Federal Energy Regulatory Commission. Mr. Coyle for the petitioner, New England Consumer Owned Systems. Mr. Adling for the state petitioners. Ms. Roberts for the petitioners, CR Club and Union of Concerned Scientists. Mr. Kennedy for the respondent, Burke. Mr. Hughes for the respondent and intervenors, New England Owner Generators Association, et al. All right, Mr. Coyle, we'll hear from you. Good morning, your honors. May it please the court. I'm John Coyle from Duncan and Allen, LLC on behalf of petitioners, Belmont, Municipal Light Department, et al. Call ourselves the New England Consumer Owned Systems here and Energy New England, LLC. Preserved four minutes time for rebuttal with my co-petitioner's counsel. We'd like to invite the court to direct questions on rebuttal anywhere they like, but unless you specify you want to hear an answer from Ms. Roberts or Mr. Aslan, I'll be the default rebuttal counsel. The order on review in this case is based not on substantial evidence or reasoned decision-making, but on speculation and sloganeering. There are four fatal flaws in this order. It is unsupported by substantial evidence or reasoned decision-making. There is no calibration of the incentive provided by the $82.49 per megawatt hour forward price or the $8.25 per megawatt hour real-time adder for so-called inventory of energy. No calibration of that incentive to need and the rate itself is neither cost-based nor market-based. Therefore, it has no inherent guarantee of justice or reasonableness. The third, the decision unreasonably, it is unreasonable to accept payments, to accept ISO New England's proposal for payments to resources that will not respond to the incentive. These are resources that naturally inventory energy can indeed have no choice. Coal-fired power plants, nuclear plants, or certain hydroelectric plants that inevitably store fuel or other energy sources and will not increase their ability to do that in response to the incentive provided by the rate and the inventory of energy program. And finally- Why is it unreasonable to provide compensation for the value provided by energy stability? And those resources are, on the one hand, they're at a major disadvantage because they're more expensive. On the other hand, they provide this distinct benefit, which is the energy is there, it's stored, and it can be used in a pinch. So if you compensate for that value, you would tend to make those resources better able to compete, and you might save the marginal ones from going under. And we know that New England has this major energy problem caused in part by a lot of these  It's an interesting hypothesis, Sharon, unfortunately, there's no evidence in the record or no analysis in the record to support it. And the point of the rate that's been established in this case is to elicit additional supplies of energy during the winter months, not just- There's no evidence to support the calibration or there's no evidence to support just the basic reasoning that I gave you, which is let's compensate for elements of value so that people contributing to security appropriately get compensated and won't have to fold when they shouldn't. There was no evidence adduced to relate the payment to the value of that allegedly stored energy, number one. Number two, as your honor knows- Yeah, I understand, but that's an argument really for the whole thing. That's not just the coal producers. There was also, your honor, a prior determination by the commission not to pay these kinds of resources because they're not in a position to respond to the incentive. Now, FERC tried to get around that in its decision. In this case, I'm referring, by the way, to prior decisions in ISO New England Inc. 152 FERC, paragraph 61-190 at paragraph 47, and the order denying rehearing in that case, 154 FERC, paragraph 61-133 at paragraph 13. As a basis for the commission's denial in that instance is there is no supplemental response from these resources in response to the supplemental payment. Now, FERC attempted to get around that in its decision here by rebranding the product as inventoried energy rather than, under the prior decision, it was winter reliability. In substance, it was inventoried oil. But the use of a semantic dodge to, in essence, rebrand the product so that more people could get paid doesn't constitute reasoned decision-making. Didn't we also, Mr. Cole, have another plan happening to address the potential retirement? And I understand Judge Katz is sort of saying, well, we wanna make sure these people are happy because they might drop out or they might retire, but I understood there was some other way to prevent that. Sorry, Your Honor, I didn't mean to step on your question. Yeah, there are, that's kind of my, with the fourth problem with the order is there is a forward capacity market in New England. And FERC did not evaluate the impact of its acceptance of the inventoried energy program here on the operation of other markets. In particular, the forward capacity market is intended to incentivize the orderly retirement of uneconomic units and their replacement by newer and more efficient generation. And by propping up units that have become uneconomic with this additional compensation, the inventoried energy program dampens the price signal that the forward capacity market is intended to send. There is also a pay-for-performance program, which is intended to incentivize generators to maintain fuel on site when they have a capacity supply obligation under the market rules so that they can produce energy on call. And again, our view was that this inventoried energy program interferes with price signals sent by the other market mechanism, the pay-for-performance mechanism. And FERC didn't evaluate it. It simply said, oh, they're complimentary because they both had sent the same thing. It's not true. They actually worked to some extent across purposes because the inventoried energy program payment to some extent offsets the incentive that the penalty structure and pay-for-performance is intended to create. Did that cover your question, Your Honor? I believe so. I think I was more focused on the cost of service plan and the sense to which that addressed the problem that it seemed as though Judge Cassis was focusing on. And that again is a different flaw in the order that FERC relies on ISO New England's January 2018 operational fuel security analysis as having created some sense of exigency about bringing in more energy supply. But by the time FERC had allowed the inventoried energy program to become effective, FERC had also accepted a cost of service agreement that would keep 1,500 megawatts of liquefied natural gas fired combined cycle capacity in service domestic eight and nine units. And so to the extent that the, I think what Your Honor is referring to is that specifically, which is not addressed really at all in the commission's reliance on the operational fuel security analysis. But also a generic rule change accepted along with the domestic eight and nine agreement that that allowed the ISO New England to retain retiring units on a cost of service basis if they were needed for fuel security. You're referring to one or two of those. Yeah, yeah. I think the latter, but yeah. Okay. Yeah. Yeah, so there were many other paths that were already in place. And again, there's no analysis of whether the incremental payment associated with the inventoried energy program is necessary or sufficient or how much additional supply do we need? How much is this additional payment likely to elicit? Really no analysis of how this incremental payment is likely to influence the retirement decisions of existing generators because there was ample evidence on this record that the incremental payment would amount best case to approximately 50 cents a kilowatt month, which is within the play of forward capacity auction prices. And for a two year interval was unlikely to influence any retirement decision. And indeed, NEPCA, New England Power Generators Association, the intervener you'll be hearing from a little later, had a great metaphor for it. He said, it's like two people working on a road crew where one's filling the pothole and the other guy is taking the fill out of the pothole. At the end of the day, you still have a pothole. This is, again, the sort of the analytical deficiencies of the proposed program. There was no exigency behind this program either. The only exigency that's actually involved is ISO New England's unilateral commitment undertaken in another case really to put before the commission a more market-based means of securing supplemental winter fuel than its previous essentially either cost-based or auction-based procurement of additional oil supplies. Paul, can you speak? Oh, sorry, Judge Katz, go ahead. Are you saying no exigency because you don't think that the macro problem is real? No. Or no exigency because you think that the pay for performance program addresses the misaligned incentives problem and the, what's the other one? The cost of service program addresses the issue I was addressing, which is suppliers that might be marginally beneficial taking into account the security value are gonna fold. If your honor will indulge me, I'd like to unpack your question a little bit. Sure. On a macro level, sure, there is a problem. I think for then Commissioner Glick, now Chairman Glick discussed that very well. Pretty compellingly. In his dissent. While you need to address the problem, you don't address the problem by creating a system where for all the evidence shows the customers would be better off if you burned the money to generate electricity. Well, but you may cut the agency a little bit more slack to the extent you think that there is a real problem. Everyone seems to think if you get to the point of rolling blackouts, those costs are gonna dwarf any cost we're talking about here. We're only talking about two years. They were bumping up against the bidding deadlines for the 23 futures. Why shouldn't we cut them a little bit of slack if we think now they're in the right ballpark, but they didn't calibrate it perfectly. Well, if I could finish unpacking your first question. All right, that's fine. But I have the answers to all those. Go ahead. The commission relies and NEPTA helps them rely on the notion that there is some urgency to coming up with a resolution to the problem that justifies bypassing principles of sound market design. Because we know ISO New England admitted in their response to FERC administrative staff's deficiency letter, that's record item 71, that there were a lot of analyses they didn't do. ISO New England didn't do. They didn't identify the amount of inventory energy needed to maintain system reliability. That's JA 515. They didn't quantify the benefits expected from the inventory energy program. They didn't evaluate the cost impacts of including opportunity costs and energy market offers. And they didn't evaluate whether or not the IEP would have ensured reliability under past splinters. They didn't evaluate whether or not the IEP was actually capable of producing generator entitlements. That's why I say you have an order here that is largely based on speculation and sloganeering, not on the kind of analysis that would support the hypotheses that are being advanced as in essence rank speculation here. There's no evidence to support those hypotheses at this point in the case. There should have been, if you wanted to support this program as just and reasonable under section 205 of the Federal Power Act, there should have been evidence. There is very little, if any, an administratively determined price. A single price is, as Chairman Blake said, not a market of any kind. It is simply an incentive bonus and spread around to resources that really are not in a position to respond to. So I... Judge Cassis, does that answer your question? Yes, thank you. Over your time, I just want to see if Judge Cassis or Judge Jackson have any other questions for this petition. No, I'm all set. Thank you. All right. We'll give you some time on rebuttal. Let's hear from Council for, I believe it's the State Petitioners. Thank you, Your Honor. I'm Chief of Court Christopher Adlin on behalf of the State Petitioners. I think there's three points I'd like to make briefly for the Court to focus the attention here. And they relate to the two primary justifications that FERC gave for approval of the IEP program. And the first point is, that the so-called miscellaneous incentive problem that Judge Cassis was referring to earlier really only applies to natural gas and oil resources. It does not apply to other resources such as nuclear, coal, biomass, and hydroelectric resources. And therefore, it is not a reasonable justification for inclusion of those other resources in this program and payment of money. The second point is that, with regard to those other resources, nuclear, coal, hydroelectric, and biomass, the justification was that this program may in some way help deter retirement of some of those resources. However, as Attorney Coyle pointed out, there simply was no record of evidence to support that notion other than anecdotal theory that, well, if you give them more money, they might do better. But we don't have analysis to show how much money is enough. And in fact, the record has contrary evidence that the Commission did not respond to. And then the third point is that, without these justifications being supported in the record, you're left with a program that saddles consumers with up to five times the cost of prior winter reliability programs, which is clearly excessive. It's serving the same basic role as these prior programs, but charging a significant more, a greater amount of money to consumers. So I'm happy to unpack any of those. I'll start with the misaligned incentives piece. I'd say that England relies on this problem, this misaligned incentive problem, based on a discussion paper that's part of the record. That paper, discussion paper, clearly, and it appears in the joint appendix at page 731. That discussion paper clearly focuses in on resources, natural gas primarily, but also oil resources, that have production uncertainty, which the discussion paper discusses, meaning that they typically don't achieve awards in the day ahead market. In other words, they know that they're likely to have the fuel they need, and be able to produce that energy at the times it's needed. That does not apply to nuclear, biomass, coal, or hydroelectric resources, typically. And indeed, some, as the discussion paper points out, some highly efficient natural gas resources are also in the day ahead market, and the misaligned incentives problem doesn't really apply to them either. And so, without that problem relating to the resources that Iceland England is trying to include in this program, you're simply, as Commissioner Glick pointed out, you're simply putting money in for no particular benefit to customers. That's the first point. The second point. Can I, Mr. Adler, before you make that point, I always try to think about things relative to our role, burden, oversight, under the statute, and what FERC's responsibility was when evaluating this IET. So the defect that you've now identified, to the extent that the plan was not tailored adequately to address misaligned incentives because it applied to these entities to whom that is not an issue. What is the nature of that problem? Is it that there wasn't evidence? Is it arbitrariness? Is that where we are? Are you suggesting that it's a just, it's a sort of a substantive problem? You understand my question, I'm sorry. It wasn't as articulate as it could have been. Okay. Yeah, I believe that the fundamental problem is it goes to the just and reasonable misuse. Because what, in effect, if you are paying resources for no particular benefit to customers, that is definitionally an accepted rate and therefore not just and reasonable. There's also an arbitrary factor here in the sense that I believe Mr. Quayle already pointed out, the FERC has previously made a determination that those resources, nuclear, coal, et cetera, should not be part of winter reliability programs for that same reason. Because they don't, they're not incentivized to procure additional fuel resources or supply agreements. They already do that as a matter of course under the market system that they operate in today. And so- But they did acknowledge that change. So to the extent that they changed positions, isn't there information in the record that indicates that FERC recognized that they had previously held a different view on this? They did, Your Honor, but they didn't provide a reasoned explanation for the change, of course, other than to say that this will help the misaligned incentives problem. However, as I pointed out, that misaligned incentives problem is not relevant to these additional resources. Paying nuclear more money will not change the misaligned incentives because they're not subject to misaligned incentives problem to begin with. And so to the extent that they acknowledged their change, of course, they didn't provide a reasoned decision for that change. And then we'll argue it's an arbitrary decision. And then we have the bigger problem on the retirement side of the equation, which is that we're simply using substantial evidence to show that we will achieve any of the benefits that are potential, that have been raised by us in English as a possibility where we might deter the retirement of some resource that provides you future energy benefits. We don't have that evidence in the record. And there was evidence- You have a history of these other plants getting forced out of the market, right? Because they will lose the competitive bids with the natural gas plants, right? Which can supply energy more cheaply. That's right. That is a problem. But they provide this distinct benefit, which the market doesn't seem to value, which is the security. I would agree with that, Your Honor, but this program, the IEP program, doesn't adequately address that problem in a targeted way. And there's two flaws. One, it doesn't set a price that's aimed at addressing that problem. And the price that it does set, there's no evidence that it would actually deter any return. And in fact, there was evidence in the record from an analyst for the Massachusetts Attorney General, Benjamin Griffith, that he did an analysis to show that the amount of revenue that would come to these resources is so small in the context of the energy and capacity resources, the revenues that they obtain, that it's unlikely to have any effect on the return of the system, particularly when this is only a two-year program. And you have large swings in energy and capacity prices from year to year that dwarfs the change in revenue that you might get from this program. That evidence is in the protest of the Massachusetts Attorney General, and it appears in the joint appendix at pages 190 to 208. It wasn't addressed by the commission either. Go ahead. And isn't the retirement history that Judge Cassius is referring to before these other mitigating measures as well? I keep coming back to that because I'm trying to understand whether and to what extent FERC took into account that there were already other sort of intervening measures dealing with the retirement problem put into place. I would agree, Your Honor, that the Pay for Performance Program went into effect 2019. It's just playing out now. We're starting to see what role it plays. But beyond some nominal lip service in the commission's order to say, we don't think that there's a problem here, they didn't provide any real analysis or explanation of how these programs would interact. And the same goes for the cost of service tariff that was approved that allows the ISO to retain resources that may retire under the market system if they're needed for liability. That wasn't clearly addressed by the commission. On your argument is that the rate is just, has to be just and reasonable and that the cost here is excessive. It seems that FERC's response is basically, look, there are benefits to this that you can't quantify because reliability of the grid is an important benefit that can be recognized and you can't necessarily quantify that. And then secondly, if there are situations where there are blackouts or power losses, that that can cost businesses in the billions of dollars to make. There's information in the record about that. And then thirdly, they talk about the differences in wholesale prices, I think, from a really bad winter in 2013 or 2012, I think it is, versus wholesale prices in 2016 or thereabouts. And there being a billion dollar difference in the wholesale prices where you had a kind of bad winter in the potential reliability problems. And so putting all those things together, FERC seems to be arguing, yeah, $300 million is a, we understand that's a big price tag, but when you look at everything in context, it's money well spent given all of these different things. What's wrong with that argument? Well, I think there are two problems with that argument. One, there's no doubt that there's this large risk factor out there, it's undefined, it's not expense, but it exists. The first problem is that this program, the IEP, we have no analysis to show that it will address that problem effectively. In fact, we think it won't address that problem effectively. The second issue is the cost. As I mentioned earlier, we've had, or ISO England has had winter reliability programs in place over a number of years in the past decade at significantly lower costs. And so we have a problem for FERC here to say, what's the justification for paying upwards to $150 million of consumer money for a program where the prior winter reliability programs came in around $30 million a year? That's a huge change without any analysis to suggest that we are actually going to receive substantially more benefit, either in reliability or just eliminating high price spikes in the market. We just don't have any analysis in this record to show that that is a justified expense. And therefore we argue that it's excessive and that there's a lack of scheduling. What evidence do you point to in the record that the reliability problems that FERC is concerned about in those two winters coming up beginning, I guess, winter of 2024, that there won't be any reliability problems during those two winters? Well, we can't say that there won't be reliability problems. And that is a problem that exists. However, ISO England, as the proponent, and FERC as the adjudicator or the regulator to determine whether this particular program addresses those needs appropriately. If we just say, well, there's a big problem coming, let's throw as much money as possible at it and hope for the best. That's essentially where we are in this case. But it seems to me that what you're arguing is that everything that we have is really sufficient or we don't need to spend all this money on this particular program. But you're saying that without pointing me to any evidence that the status quo is working? Sure. So the alternative here, Your Honor, would be to reintroduce a program like the former winter reliability programs, which were significantly cheaper. And though every winter is different, they met the need and they did incentivize resources to retain additional fuel sources for the winter period. We haven't seen any evidence that that would not be sufficient going forward. It's just the operational fuel security assessment we've done in 2018, I believe, that says under these certain assumptions, we see that there's going to be a problem. But those assumptions are just assumptions. And it's really the only evidence in the record here that there will be a problem. I think we can all agree that there are these concerns, but we don't know the extent of those concerns. And therefore we can't say that this program will adequately address them. All right. In the interest of time, unless there's further questions from Judge Katz and Judge Jackson, we'll move on. Thank you. Roberts. Thank you. May it please the court, Casey Roberts on behalf of environmental petitioners. The inventory to energy program could cost consumers more than $300 million over two years. So it's fair to ask that FERC rely upon substantial evidence of an urgent reliability problem before approving the admittedly substandard design of this program on grounds that there wasn't time to do a more thorough job. But the order on review fails to establish a near-term reliability problem not already addressed by ISO New England's existing rules. In a single sentence of its order, FERC passingly mentions the operational fuel security analysis and the findings in its 2018 order as justification for the program. FERC and NEPCA make a lot of this single sentence in their briefs. In doing so, draw from parts of the analysis that FERC never mentioned in either the July 2018 order or the one under review here. I think it's particularly important listening to some of the questions earlier to distinguish between what FERC has now said in its briefs to bolster the order below and what was actually in that order below, which is very, very little on the existence of an urgent problem. So the findings in that 2018 order were specific to the risks posed by the retirement of the MIFIC units. And that makes sense because that was the question before the commission at the time. And then following that 2018 order, the commission approved a program to allow ISO New England to prevent the retirement of units as needed to ensure winter energy adequacy. Those are the cost of service agreements. And the ISO has used that authority to delay the retirement of the MIFIC units for several years at significant cost to consumers. Notably, ISO New England recently decided that those units were no longer necessary for fuel security in the winter of 24, 25, which sort of belies the breathless case otherwise that there's an imminent fuel security problem. In the order below, there's just a single order on review here. The commission never adequately explained why that authority that it gave ISO New England to prevent the retirement of units needed for fuel security is inadequate to address any imminent risk. It's touched upon very, very briefly in paragraph 117 of the commission's order. And the commission then simply refers back to this misaligned incentives theory, which as Mr. Aslan explained, doesn't really connect to the retirement concern, which is mostly about generators who kind of don't suffer from the so-called misaligned incentives problem. And I'll note that in the December 2020 order, the commission concluded that the concerns it had expressed back in 2018 had actually been resolved by this retirement prevention cost of service program. And that's when the order in which FERC terminated the section 206 proceeding. And ISO New England itself described the IEP, the Inventory-to-Energy Program, as being aimed at precisely the same problems identified by the commission in the 2018 proceeding. So essentially what we have here is FERC allowing ISO New England to sort of double dip on the findings in that 2018 proceeding, not only implement the cost of service provisions, but also implement another interim program without explaining why there's still some urgent problem that hasn't been addressed. So the second error in FERC's order that I wanna discuss is the commission's complete failure to respond to environmental petitioners' argument that the program is unduly discriminatory. We argued the program discriminates by providing compensation to an arbitrary subset of resources that alleviate the region's dependency on just-in-time delivery of gas from the region's pipeline system. And as an example, we submitted evidence produced by ISO New England showing how offshore wind production reduces the drawdown on fuel supplies in the region during cold snaps. But FERC responded only to a strawman version of our argument, arguing why wind and solar resources aren't similarly situated in their ability to provide inventoried energy. That wasn't our argument below. You can go into it if there's questions, but essentially FERC did not meet its obligation to respond to legitimate objections. Can you just summarize, so what is your discrimination argument? Yeah, so our discrimination argument is that in defining this inventoried energy product as the solution to the broader alleged problem of winter energy adequacy in the region, FERC has created a product that only certain kinds of resources can be eligible for. Right, so the problem is too many resources relying on just-in-time deliveries from the pipeline system. Therefore, they're not able to generate electricity when it's needed, when there's also demand on that pipeline system from, you know, for building uses, heating, that sort of thing. So renewable energy that alleviates the drawdown on the region's fuel supplies and that can generate notwithstanding reliance on that pipeline system, those resources are similarly situated to resources that can inventory fuel in terms of their ability to help address the core problem. So by- Yeah, but- Okay. But it sort of seems to me like it's in the nature of the definition, to that you have a particular problem that you're trying to address, and it seems, you know, you say it's broad, but it is these kinds of resources that are not gonna be able to produce when called upon because the incentives are wrong. And by its definition, that doesn't apply to the kinds of resources that you're talking about. They're able to produce regardless. I don't know how that's necessarily discriminatory. It's that the problem doesn't encompass the groups that you're talking about. So of course the solution isn't addressed to them. I hear what you're saying, except when the solution is money, that incentives are being paid to these other generators to help those generators fix a particular deficiency that they have in their ability to generate electricity, and then similar benefits are not available to other resource types. It's not an efficient or just a reasonable way of getting at the problem. I mean, FERC has actually acknowledged this sort of undue discrimination framework in some of its orders on the prior winter reliability programs, which Mr. Coyle was explaining earlier, and did require IS in New England in coming back with a revised winter reliability program to address whether it could be done in a way that was more fuel neutral, was sort of the term they used at the time, and if it couldn't be done in a more fuel neutral way to explain why. So Judge Jackson, your questions I think are valid, and they're ones that FERC should have considered, but they didn't even address our undue discrimination argument. They pretended it was this much simpler argument about whether wind and solar could provide inventoried energy, which is a rather simple answer, but that was not our question. So we would like FERC to be considering this in the first instance, as it should under the APA. All right, any other questions, Judge Katsas, Judge Jackson? No, thank you. All right, we'll hear from Mr. Kennedy who will respond to FERC. All right. Good morning, Your Honors. Robert Kennedy on behalf of the commission. Before touching on the specific points raised by petitioners in their objections to the program, I think it's important to step back sort of as Judge Katsas did and set the context here, which is important. In this case, the commission was presented with forecasts indicating that from the system operator in New England, indicating that if there isn't a course correction, there's significant risk of energy shortfalls on the coldest days of the year. And as we just saw this winter in Texas, that can have tremendous public welfare impacts. The commission was presented with a stopgap two-year program to try and address that, kind of tide the market over until this flaw in the market that doesn't value fuel reliability can be permanently resolved. And it does it by compensating all resources who are able to provide the product that the system operator is looking for, inventory to energy, all units who are able to respond to the system operator's request to run on the coldest days of the year. And the commission acknowledges, as the New England acknowledgment made this proposal, that it's certainly not perfect. I ask you, assume I think the problem is real and that this would be a reasonable, but not though not perfect response in the absence of anything else. But why do you need this program on a semi-emergency basis where you have pay for performance, which addresses misaligned incentives. And if a penalty on pay for performance is too low to realign the incentives, the obvious solution would seem to be just raise the penalty. And then you have cost of service to address the distinct problem of the high cost, high secure providers who might otherwise go out of business. Why do you need this on top of those two? So with respect to cost of service, if you go back to the mystic water, which is essentially incorporated in this order, in paragraph 55, the commission made its ultimate finding that not only does the region need these cost of service agreements, but there also needs to be a, it needs to better improve its market design to better address regional fuel security revisions. And it made that finding because in this response to some of the arguments we heard today, you know, the misaligned incentive problem is at the heart of this, that natural gas generators, which on any given day, on normal days, are roughly 45, 50% of the region's generation need. They don't have the financial incentive to enter into firm fuel delivery agreements because as explained in the brief, as explained in the material submitted by the system operator, that has an upfront cost. And the end result is it brings down the price of energy. And if you do all the probability analyses and the math, it's not worth it most of the time for the generators to do that. So just having these cost of service agreements wouldn't address that situation at all. And second, these cost of service agreements, just to give you some context here, they're massively expensive. I mean, we talked about the mystic agreement. That's, I believe, in the neighborhood of 400 million for one unit. Two years, one generating station in one area of the region. The commission has always viewed these as sort of a tool of last resort. So the inventory energy program is a interim tool. So you don't have to resort to that too much. In fact, if you go back and look at these court's opinions in Connecticut Department of Public Utility and some of the other ones from the late 2000 timeframes, we have a capacity market in New England because there were so many cost of service agreements that were being used with these generators who were retiring that the stakeholders had to come up with a different solution. So that never went- Mr. Kennedy, I'm struggling to understand why your response is actually responsive to Judge Cassius because he pointed out two different programs. Correct. And to the extent that misaligned incentives is the problem, I'm wondering why entities that don't have that problem are being compensated in this way and why the program that is directed, the other interim pay for performance or whatnot, why that is not sufficient to deal with your misaligned incentives problem. Correct. I was responding to the second half of Judge Cassius' question, did take your two points which should address his as well. Why the eligibility question, why are we including these resources who in the normal course of business have fuel on site during the coldest days of the year? And as what the system operator has done here, it has identified a market flaw that the market does not value this reliability attribute that they bring to the table. What does that mean? I admit I'm not an expert. Sure. The system does not value them, meaning they're not being paid enough to keep the fuel on site? Correct, I mean, no, they do keep the fuel on site. Right. But the cost that we already have before your program, right? Correct. They keep the fuel on site, and isn't that the objective, we want them to keep the fuel on site? Correct, the problem is the revenues they derive from ISN Wing's other markets, energy markets, capacity markets, ancillary services are insufficient to cover their costs. So they're going away. And just to signal why that's so important, and I believe this is in the fuel security analysis, there's an example in a typical day, in a typical month in New England, there was a cold snap, and I believe it went over the end of December 2017 to early 2018. I believe coal was like 0.3% all of December until that one week when it was about 24% of the megawatts produced. Right, but can I ask you a question? Are they going away based on evidence that you have looked at after the implementation of the cost for performance, after the implementation of the other interim measures that were supposed to keep them from going away? Do we have evidence related to that? That the retirement studies have been updated since paper performance? Yes. I'm not sure when the projections date from. I know ISO New England put forward those numbers in the fuel security agreement and in this filing, which post-date the beginning of paper performance. And if you kind of look at the- I'm sorry, does paper performance apply to the coal and nuclear suppliers? I thought it was- I believe it's everyone who has a capacity supply obligation. Okay. Now they're not duplicative. Paper performance either pays you or penalizes you for not providing energy during scarcity conditions. The inventory energy program compensates you for having this reliability attribute, being able to answer the- I understand, but paper performance should tend to help make the coal producers more viable because it's easy for them to make a capacity commitment and satisfy it. Well, if you look at the discussion paper put forward by the ISO in, and this is around J749 through 751, it explains why the incentives, and it goes through various scarcity analyses, a probability analysis, and explains why the incentives created by the paper performance problem haven't solved the- But that's directed to misaligned incentives which applies to the natural gas people. What I'm trying to understand, dovetailing with Judge Caster's question, is to the extent that paper performance does apply to biogas and those stored fuel capacity entities, and they get it, why doesn't that help to solve the problem of their going under? Well, I think because the main paper performance largely is a stick. If you take on a commitment and you can't meet it, you get penalized. But they can't meet it. Right, but already the revenues that they're getting, this is a capacity, paper performance interacts with the capacity market. The revenues they're getting from that market and the energy market are insufficient to cover their costs and keep them going. At least that's- And they don't get more for paper. I thought there was also a benefit if you can meet it under paper performance. Well, there's a baseline, you get a baseline capacity payment, and as my understanding of paper performance, if there's a scarcity condition, I'm not sure the number of times that comes up per year, but if you overproduce, yes, you can get some benefit. But I believe what the system operator says here is looking at the baseline, which includes paper performance, that the market still doesn't value these resources enough to cover their costs and have them there in the future when we need to call them. What's your response to Mr. Coyle's point that even if that's true, even if we have some nebulous understanding of the market undervaluing these resources, there doesn't seem to be any analysis of how much more they need in order to prevent them from retirement, of the extent of the problem concerning their undervalue. Like, I didn't see anything, and I think many of your opponents in their briefs pointed out this vacuum of analysis that would actually substantiate these contentions. So what do you say about that? And I missed it. So the system operator explained, just to respond to a point that's inherent in your question that Councilor New Hampshire raised, that the point is not that this is going to give them a revenue stream that's enough to cover the shortfall that currently exists that will take them out of the risk for retirement. The point is this will allow them to lower their bids into the capacity market and obtain a capacity commitment for future years and get the revenue stream through that. System operator, yes, there is no analysis of here's the 5,000 megawatts that are at risk for retirement, here's how much they need. No, that is not in the record. What we have is a system operator identifying these resources being at risk and providing a proposal based on sound economic theory and in their judgment will incent these resources to stay in the market and delay their retirements for two years until the region can come together and deal with a long-term proposal. And part of the reason that they didn't go through that exercise and the commission found this reasonable is because this has been going on for a decade, trying to come up with a solution to this problem. There's a myriad of factors as to why it is a problem and why it's significant. I don't know if the longevity helps you or hurts you. So the point- If it's been going on for a decade, there should be some data about it, right? I mean, there should be some- Well, there is data, Your Honor. If you look through the dual security agreement, the retirement study, I think, was first done back in 2012, 2014. There was 8,100 megawatts at risk for retirement. And now we're down to 5,000. And the entire region is just 30,000. So that's a significant clip. So the forecasts have been coming true, unfortunately. And what changed here is in 2018, ISO New England went through this detailed analysis and found, hey, you know what? These things are really important. We need them on the coldest days of the year. And right now, the market's in flux and we don't have a ready available replacement. So we need to recognize the value they provide for the market and develop a way to keep them online. Why there was no detailed study before then is the IO explained it would take some time. And this program needed to be simple enough for generators to understand and in place before they made the retirement decisions, which are generally, if I'm doing the math right, four years in advance from when it happens. So that's part of the explanation is why there's not a full-blown study. But it's based on a reasonable theory put forward by the system, reasonable economic principles put forward by the system operator upon which the commission relied. Now there's some suggestion in the brief, oh, well, the capacity prices are coming down. That means this whole thing's a sham. Obviously that's a benefit to consumers, but as the system operator explains, in ISO New England, they use a downward sloping demand curve. So as the price comes down, there's actually more capacity awards. And in the system operator's opinion, who runs these markets, that's an indication that fewer retirements will occur. Can I ask you, Mr. Kennedy, does FERC give deference to system operators in their analysis? Is there some kind of a thing that happens in FERC's own review of things that they sort of just defer to what the system operator wants? No, I mean, so I think as the commission said in this order, you know, it held the system operator to an interim program doesn't mean they don't need to support it with substantial evidence, but these are the people running the markets. They are putting forward sworn testimony. Some of the forward rate and the determination as to what that should be to incent enough resources to participate was prepared by an outside consultant. So definitely there is some expertise there. And wasn't there a point at which... It does not give blind deference to this. Wasn't there a point at which the system operator updated the data, updated the information? I think Ms. Roberts talked about it, that they actually said that we don't need as much because they're not retiring as fast in the wake of these other programs. Maybe I had that wrong, but I thought it was an update. I'm not quite certain what Ms. Roberts was referring to. I'm not saying it doesn't exist, but I'm not certain what she's referring to. Maybe I just threw her under the bus. Maybe she wasn't even talking about that. Again, this has been going on a while. It's still going on, so there's a lot of orders that are inside and outside the records. I would just say to my first response is obviously the issue before the commission is what's in the record at that time when it's facing this. The commission in the MISTIC orders had found that the processes, methodologies used by the system operator were reasonable. I think you'll see some discussion in there. Some of the environmental groups had indicated that things had changed a bit there and the system operator responded, indicating that may be the case, but also we used some very conservative assumptions that kind of undercut the fuel security, that underplayed the fuel security risks. So the commission found that on balance, it was a reasonable analysis. I mean, I will say, again, kind of to both your questions about whether the commission just blindly relies on the system operator, the answer is no. You see that by the fact that the commission recently rejected ISO New England's proposed long-term proposal here because it didn't think that it was reasonably calculated to address the risk.  whether it still holds the water it did when the commission was looking at this back then. I think if you look at that, and I think it's a December, 2020 order, rejecting the ISO's long-term proposal, the commission does rely on it. And that's part of the problem, that the long-term proposal by ISO New England didn't really address some of the risks laid out in the fuel security analysis. I see I'm in the red, unless there's any questions from the panel, I'll defer to our interviewers. All right, Judge Katsas, Judge Jackson. All set. All right, we'll hear from Mr. Hughes. Thank you, your honor, and may it please the court, Paul Hughes for the New England Power Generators Association. I'd like to begin by focusing on three broad principles and then responding to several of the issues that have come up today. The first is, of course, there can be no serious dispute that absent action, New England faces severe risk of cold weather induced blackouts. Second, FERC's approval of an interim program must be evaluated against the backdrop of this exigency. The question here is not whether ISO New England's program is a perfect one, is whether FERC acted in arbitrary and capricious fashion in determining this at just least one reasonable and just proposal. The need for a simple solution in a short period of time appropriately bears on that analysis. Can you explain the exigency, Mr. Hughes? What exactly are you saying was the exigent circumstance? Here, your honor, the exigent circumstance was the extensive analysis that ISO New England took in 2018. They issued a report in January of 2018, and then in July of 2018, FERC identified the severe cold weather induced blackout risk and directed ISO New England to take a response. ISO New England, from that time, in less than eight months, put forth this proposal as an interim proposal only for two years. They had to act in that period of time because what ISO New England said in this proposal was critical in part was the forward-looking component of this, so it could send signals to resources not to retire. And your honor, to make those retirement D-list bids, the record is clear that those had to be made for the winters of 23 to 24 by March of 2019. So from January when this report was issued to July of 2018, they had until March of 2019 to put in place a solution that would affect retirement determinations for the winter of 23 to 24. And so what is the evidence that it actually is affecting or will affect and to what degree it affects retirement determination? Thank you, your honor. So FERC engaged in relatively extensive analysis that this would have an effect on these signals. So for example, at records page 520 to 521 at paragraphs 95 to 96 of the decision, what for reasons is that providing these sorts of incentives create a pressure in the direction not for these resources not to retire. And this was against the backdrop as been discussed of 5,000 megawatts of fuel secure resources at the risk of retirement. Now, I note the court's point earlier that there could be more calculation as to tethering these, but the issue is for this interim proposal, is this sufficient for an agency to take interim exogenous sort of action? We think the answer there is yes. We recognize that as ISO New England is working towards a permanent long-term solution that the standards that the court may impose may well differ given the nature of the program. But for this program to have a solution in place for 2023 to 2025, we think FERC was well within its authority to adopt this as a particular solution. And let me add, I think it also bears noting, and this goes to Mr. Quayle's point about the pothole filling, the pothole unfilling. This program is already underway because the two capacity options for the summer to the winters that are at issue have already been run in February of 2020 and February of 2021. So the notion that the retirement decisions based on the inventory to energy program have already in fact been made. And as ISO New England points out in its brief at 11 to 12, of course, part of the nature of this program may well be to suppress the pricing in the four capacity options. Although it's quite complex and there are many factors, of course, that go into it, ISO New England would not say that the program is the sole basis. As a matter of fact, the four capacity pricing has decreased. So that has occurred following the nature of this program. And so from the intervening- Mr. Hughes, what impact, if any, is the other mitigating plans that were put into place to address the retirement exigency that you say exists? Thank you, Your Honor. We can talk both about the cost of service and pay for performance. So on the cost of service plans, first about the MSTIC cost of service in particular. As I understand, the MSTIC are still retiring in 2024. So it won't provide the field security for the winter of 24 to 25 that's at issue here. But for the December 2018 FERC order that has a broader cost of service, there are two different responses to that, Your Honor. The first is that paragraph 117 of FERC's decision. It recognizes that as well as the pay for performance and finds nonetheless that it's not a sufficient action. And I think there are a few reasons for that. As Mr. Kennedy explained, that the cost of service mechanism in the December 2018 order is highly disfavored. It is an out-of-market solution entirely and is one that is of last resort. And I think it's notable that petitioners here try to criticize the- Mr. Hughes, I'm not asking you whether it's a good thing, disfavored or not. I'm asking you whether it works. What's the evidence that there was still a need for IEP even after you had these other programs? Your Honor, I think that's found in ISO New England's study that underlies this. And it's the discussion that's at pages 138 to 100. Oh, I'm sorry, Your Honor. It's at appendix pages 351 to 352. That's the ISO New England's filing that provides more details as to why against the baseline programs, there was additional need for the incentives to be created for fuel secure resources to remain online, not retire. That's the retirement incentive. And then the real-time incentives for other generators to ensure fuel secure resources. And one small point there, Your Honor, I think it's notable that the dissenting commissioner below and petitioners sees on the notion that they suggest one-third or so of generators or resources might inventory energy in the status quo or absence of the program. But that suggests on its face that two-thirds of those who would be responding to the program would not be inventorying energy in the status quo. I think that's rather compelling evidence that there will be a change in behavior that results from this program in a way that's quite important. And further to the notion that generators might engage in this activity, as I said at the outset, this is about also sending forward signals and for the auctions that have already occurred. I think that's relatively difficult to just unwind at this point. But finally, to the point that the court has previously discussed, what the whole program turns on is the premise that inventory energy provides a social good, that there is a utility that's based in it. And at the status quo, prior to the program, there was insufficient levels of inventory energy to meet winter demand needs. It was reasonable for FERC to say, we need to create a market and provide a compensation basis, both on a forward basis and a spot basis to ensure that if we don't have enough of this good, compensating for it to ensure that we get to socially useful levels of this. And in many ways, this is just like the way the capacity markets operate generally, is when one thinks about the capacity markets, of course, there are going to be generators out there who are going to be able to provide capacity even in the absence of a forward capacity market. But the reason that we have those capacity markets is because we recognize there has to be sufficient capacity and a guarantee of that sufficient capacity in the future for when it's needed. That's the same- Mr. Hughes, can I ask you, if we disagree with you, and we think that this matter needs to be remanded to the agency, no one really has talked about with or without BAKER, something that you raised in terms of the intertwined, the options are already happening, touches on that. So is it your view that if it were to be remanded, it would have to be without BAKER because there would be disruption? My thought was that if there were a remand, it would be fine because this is about 2023, 2024. We haven't really done this yet, but explain to me what your point or what your view would be on with or without BAKER. Thank you, Your Honor. And of course, we think that the petition should be not denied. But to answer the court's question, if the court were inclined to grant any petition, we absolutely think it should be without BAKER because of the fact that, again, we are midway through the process here. The auctions have already been run. The delist bids have already occurred. We are years past that now for the delivery of the energy in the winters of 2023, 2024, and 2024 to 2025. And so if, again, we disagree with this, but if the court were of the view that the court needed more explanation for the result it reached, a remand without BAKER would be absolutely critical not to disrupt the system because all of the generators have bid into this market on the basis of the Inventory to Energy Program's existence. Those are already terminations that have long since been made in markets that have since been constructed as a result. So again, we think that the petition should be denied, but barring that, any remand certainly should be without BAKER. Thank you. I'm happy to answer any questions. Any other questions, Judge Katz's, Judge Jackson? Think for me. All right, we'll hear from counsel and rebuttal.  Thank you for your generosity, Your Honor. I appreciate it. There's a lot to unpack in that discussion. Let me go back to Judge Jackson's question about BAKER first. Excuse me. I don't believe that Forward Capacity Auction 15, which covers 24 through 25 has been run as yet. The bids for the FCA 14, which covers the 2023 to 2024 were submitted in alternative, an IEP in effect and a no IEP in effect. So that's relatively easy to sort. The more basic question that you have to confront when deciding on BAKER is whether the flaws in the underlying order are something that the agency can cure. And here, there is not a sufficient record or sufficient reasoning behind the record for the reasons we've detailed at length in our briefs and our arguments to enable the FERC to salvage this order. So absolutely, if you decide, you have to remand with BAKER. And so is that because there's not sufficient evidence in your view to support what FERC determined? Why can't they cure it with more of a reasoned or rational explanation? The analysis, and I'm doing this loosely a little bit, Your Honor, but as I understand the courts, I believe it's the Allied Signal decision. You have criteria that guide the decision whether or not to grant BAKER to her. And typically, the way the court applies those criteria are, is the deficiency in the order something that the agency is likely to be able to cure on remand with, for example, better explanation than they supply, but it's plausible that the agency reached the right result. Right. Our position here is that the record before the agency does not furnish a sufficient basis for just fixing this order with an explanation, right? That the analytical defects are so egregious in this order that you have to vacate and tell the agency to start over again. Now, that's not an emergency. It takes literally five months to put a winter reliability program in place. So if there is a crisis, the way that worked for the previous eight or 10 years can be made to work again. It's not like the lights are gonna go off or people are gonna suffer rolling blackouts. There are means to deal with this. Also on the question, the impact on ongoing forward capacity auctions, as I said, one I believe that has occurred had alternative bids. To the extent I'm wrong about forward capacity auction 15, that auction occurred with full knowledge and notice that this case was on appeal. So bidders in that auction were able to factor that risk into their bids. There is no basis for remand without vacater in this case. I wanted also to go back and revisit the question of misaligned incentives generally and touch on a quick response to Judge Wilkins' observation that you can't put a price on reliability. In the crudest terms, the misaligned incentives slogan argues that the value of service to the customer is an appropriate basis for setting utility rates. FERC itself has held in Western Systems Power Pool cited in our brief 55 FERC paragraph 61099 at page 61,316. That value of service pricing to the customer is an attribute of monopoly pricing, right? You think about what the value of lost load is. It's tens of thousands of dollars per megawatt hour, okay? If that is your ultimate limit on pricing, you are not producing just and reasonable rates. And yet, that is the end state of the misaligned incentives argument. There is no limiting principle on that argument. And for that reason, it is not a sound basis for setting a utility rate and it certainly doesn't justify quintupling the cost to consumers of ensuring that the lights stay on in the wintertime, which is what this order does. All right, we're out of time. So I'll be asking the court to ask a free man with Fagan. Thank you. All right, thank you. We have the argument. We will take the matter under advice.
judges: Wilkins, Katsas, Jackson